UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN HENRY RAY,

                    Petitioner,                        Case Number 11-11100
                                                    Honorable David M. Lawson

v.

CATHERINE S. BAUMAN,
Warden, Alger Correctional Facility,

                    Respondent.
_____/

## OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS (AFTER REMAND)

Petitioner John Henry Ray is serving a life sentence for first-degree murder. He alleged in his habeas corpus petition, among many other things, that his Sixth Amendment rights were abridged when his lawyer was excluded from a critical stage of his state prosecution. His habeas corpus case returns to this Court following a remand by the court of appeals to consider two main issues: "(1) whether there was an adjudication on the merits as to Ray's [*United States v.*] *Cronic*[, 466 U.S. 648 (1984)] claim, and (2) whether Ray is entitled to relief [on that claim] under the appropriate standard of review." *Ray v. Maclaren*, 655 F. App'x 301, 311 (6th Cir. 2016). The court also vacated and remanded for reconsideration this Court's decision denying relief on Ray's claim that his appellate attorney did not provide constitutionally adequate representation. *Id.* at 312. While those questions were under consideration, the petitioner filed a motion for relief from judgment concerning his claim under *Brady v. Maryland*, 373 U.S. 83 (1963), based on a newly disclosed unsealed transcript of the *in camera* conference between the state trial judge and the prosecutor, which did not include defense counsel, and in which it was revealed that one of the State's principal witnesses against the petitioner had been employed by the police as a paid

confidential informant, before and after the murders of which the petitioner was convicted. The state attorney general has not responded to that motion. The parties presented supplemental briefs, and the Court heard oral argument.

With the perspective furnished by the court of appeals, and the revelations from the unsealed state transcript (which the attorney general failed to file with the initial batch of Rule 5 materials), it is apparent that the petitioner raised his *Cronic* claim at an appropriate time in the state court, but the court evidently misunderstood the argument, and therefore never addressed it on the merits. This Court, therefore, must give it fresh review, and not apply the highly deferential standard prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The *in camera* conference was a critical stage of the state criminal proceedings. The petitioner's attorney was not allowed to attend. His appellate attorney's failure to raise that issue on direct appeal amounted to deficient performance, which prejudiced the petitioner. And the information revealed at that conference was exculpatory and material to the defense. The state prosecutor's failure to disclose that information violated clearly established constitutional requirements under Supreme Court jurisprudence, and that lapse undermines confidence in the outcome of the case. These flaws entitle Ray to a new trial, and, failing that, to release from state custody.

## I.

### A.

The parties are familiar with the facts, but they are repeated here as summarized in earlier opinions. John Henry Ray was convicted along with two codefendants, Juanita Michelle-Elam and Jairus Andrae Perkins, following a jury trial in the Wayne County, Michigan circuit court. Ray was convicted of two counts of second-degree murder, two counts of first-degree felony murder, one

count of killing an unborn child, two counts of assault with intent to do great bodily harm less than murder, two counts of armed robbery, one count of first-degree home invasion, one count of felon in possession of a firearm, and one count of possession of a firearm while committing a felony. He was sentenced to life imprisonment without parole for the first-degree murder convictions and lesser prison terms for the other convictions.

The facts of the case were summarized briefly by the Michigan Court of Appeals on the three defendants' joint direct appeal as follows:

> Defendant Perkins, aged twenty-one, his girlfriend, defendant Elam, aged twenty-eight, and defendant Ray, aged thirty-eight, were involved in the killing of a man, Deshone Douglas Moore, aged twenty-eight, and a pregnant woman, Amanda Zarbaugh, aged twenty, and her unborn child, during the course of an armed robbery at Zarbaugh's residence in Romulus, Michigan in July 2004. Defendant Elam was already in the house with the two victims when defendants Perkins and Ray arrived with guns. Defendant Perkins and Ray encountered Christopher Straughter and Ebonie Booker exiting the house when they arrived. Defendant Perkins ran into the house just prior to fatal shots being heard, and defendant Ray stayed outside and held the witnesses at gunpoint.

*People v. Ray*, No. 260161, 2006 WL 1330320, at *2 (Mich. Ct. App. May 16, 2006).

The Sixth Circuit added details, which were excerpted from the state trial court's opinion denying the petitioner's post-conviction motion for relief from judgment:

> This case arises from the planned armed robbery of Christopher Straughter by Juanita Elam, her boyfriend Jarius Perkins and friend John Ray. Straughter was a robbery target because the defendants believed he was a dope dealer who carried large sums of cash.
>
> Defendant Ray (twenty one years old) and two co-defendants Elam (twenty eight) and Perkins (thirty eight) went to Amanda Zarbaugh's house to rob Straughter. Zarbaugh was pregnant with an unborn child and was in the house with Deshone D. Moore.
>
> Elam knew both Straughter and Zarbaugh. Elam went to Zarbaugh's alone. Elam enticed Straughter via phone to come to Zarbaugh's house under the guise that she wanted to buy drugs and to talk business with him. Elam became insistent that

Straughter come to Zarbaugh's house. She said she would remain there until Straughter arrived.

Elam then called Perkins' cell phone. The inference from that call is that Elam alerted Perkins and Ray to come to the house.

Straughter came to the house and entered with Ebonie Booker. They spoke with Elam. Elam also spoke with Moore, who was in the house with Zarbaugh. Straughter and Booker headed out the front door. They encountered Perkins and Ray, who were waiting outside the house with guns. Perkins and Ray rushed Straughter and Booker with drawn handguns. Perkins and Ray robbed Straughter and Booker at gunpoint and forced them to the ground.

Ray stood over Straughter and Booker at gunpoint outside the house while Perkins went into the house. Elam, Zarbaugh and Moore were still inside the house. Shots were fired. Perkins and Elam came out of the house.

Zarbaugh and Moore were discovered executed, as was Zarbaugh's unborn child. Cash was also taken.

Straughter and Booker were threatened as they lay on the ground. They overheard discussions about killing them. They got up and ran. Straughter and Booker were shot at, but the guns did not discharge because they were either empty or jammed. Straughter and Booker continued to run from the scene. All three perpetrators, Elam, Ray and Perkins, fled the scene in Perkins' silver Explorer.

*Ray v. Maclaren*, 655 F. App'x 301, 303 (6th Cir. 2016).

Ray's defense at trial centered on Straughter's credibility. Ray's attorney pointed out that Straughter had made several inconsistent statements about the incident. Defense counsel acknowledged that Ray was present at the house, but he asserted that Ray never possessed a firearm, there were no shots fired outside the house, and Ray had nothing to do with the robbery or the killings. He argued that Straughter's version was not worthy of belief.

The jury was unconvinced. The petitioner's convictions were affirmed on direct appeal (although his convictions for second-degree murder were vacated, as duplicative of the first-degree murder convictions), *People v. Ray*, 2006 WL 1330320, and the state supreme court denied leave

to appeal, 477 Mich. 941, 723 N.W.2d 824 (2006) (Table). The petitioner then filed a post-conviction motion for relief from judgment under Michigan Court Rule 6.500, *et. seq.*, which was denied by the trial court. *People v. Ray*, No. 04-008291-01 (Wayne County Circuit Court April 13, 2009). The Michigan appellate courts denied the petitioner leave to appeal. *People v. Ray*, No. 295244 (Mich. Ct. App. April 2, 2010); *lv. den.* 488 Mich. 856, 787 N.W.2d 120 (2010) (Table).

## B.

On March 16, 2011, the petitioner filed a *pro se* petition for a writ of habeas corpus raising eighteen claims of constitutional error in the state court proceedings. On July 9, 2014, the Court issued an opinion denying the petition, after finding that all of the claims were without merit. However, the Court issued a certificate of appealability as to the seventeenth ground for relief, in which the question raised was "[w]hether the prisoner was deprived of counsel at a critical stage due to *ex parte* communications between the trial court and prosecutor." The Sixth Circuit expanded the certificate of appealability to include a claim that the petitioner's appellate counsel was ineffective by failing to raise the *Cronic* issue on direct appeal. The court of appeals concluded that "the district court committed reversible error [by] failing to determine whether Ray's *Cronic* claim was adjudicated on the merits before applying AEDPA deference to the state court decision." *Ray*, 655 F. App'x at 310.

The court of appeals noted that, because the resolution of the ineffective assistance claim would depend on resolution of the *Cronic* claim, it did not reach the merits of the ineffective assistance claim, and it also included that claim within the scope of the remand. *Id.* at 312 ("[W]e also vacate the district court's denial of habeas relief on Ray's ineffective-assistance-of-

appellate-counsel claim, and remand to the district court to consider the claim in light of its resolution of Ray's *Cronic* claim on remand.").

After the case was remanded, and after the parties filed supplemental briefs on the issues noted above, the state trial court granted a motion by the Wayne County prosecutor to unseal the transcript of the *in camera* conference between the state court trial judge and the prosecutor. Subsequently, based on information revealed in that transcript, Ray filed a motion for relief from judgment as to the denial of his thirteenth claim, in which the question raised was "[w]hether the prosecutor committed misconduct by withholding exculpatory evidence." The State did not file any response to that motion.

## II.

The State raised certain procedural defenses in its answer to the petition. This Court found no need to address them, because they did not impose a jurisdictional bar and at the time no merit was found in any of the petitioner's eighteen claims. *See Ray v. Perry*, No. 11-11100, 2014 WL 3555968, at *4 (E.D. Mich. July 9, 2014). The State never challenged that approach on appeal, and never re-asserted those procedural defenses as grounds for affirming this Court's original decision. *See Ray v. Maclaren*, 655 F. App'x at 305 n.4. Nonetheless, the State still relies on its statute-of-limitations and procedural default defenses, so the Court will address them here.

## A.

AEDPA, which became effective on April 24, 1996, governs this action because the petitioner filed his petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA amended 28 U.S.C. § 2244 to include a one-year period of limitations for habeas petitions brought by prisoners challenging state court judgments. *Vroman v. Brigano*, 346

F.3d 598, 601 (6th Cir. 2003). The statute includes several events that trigger the commencement of the one-year period, but the relevant starting time here is the date Ray's state convictions became final "by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). That date, the parties agree, was February 27, 2007. The petition in this case was not filed (that is, signed and dated, *see Williams v. Birkett*, 670 F.3d 729, 732 n.1 (6th Cir. 2012) (explaining the "prison mailbox rule")) until March 14, 2011.

Ray's main argument that his filing was timely is based on the statutory tolling provision found in 28 U.S.C. § 2244(d)(2), which says that we do not count "[t]he time during which a properly filed application for State post-conviction . . . review . . . is pending." *See Holbrook v. Curtin*, 833 F.3d 612, 615 (6th Cir. 2016). When the Court addressed this issue the first time around, the record of Ray's post-conviction filings was "not clear." *Ray v. Perry*, 2014 WL 3555968, at *3. Since then, additional Rule 5 materials have shed some light on those state proceedings.

Ray filed a *pro se* motion for relief from judgment in the trial court on March 23, 2007, 24 days into the one-year limitations period. The trial judge dismissed the motion without prejudice on June 19, 2007, but then reinstated the petitioner's motion for relief from judgment on February 12, 2008. The State contends that the limitations period was not tolled for the 237 days that elapsed between the dismissal and the reinstatement. Under that view, 261 days had elapsed on the one-year limitations period. According to the State, the petitioner had 104 days remaining after the Michigan Supreme Court denied his post-conviction appeal on September 9, 2010, to file his habeas petition, which calculates to December 23, 2010. The State insists that the March 14, 2011 filing came too late.

It appears, however, that the post-conviction motion was "dismissed" so that the trial judge could appoint counsel for Ray, and that after a lawyer was appointed, the original motion was reinstated and supplemented. The question presented here is whether the original post-conviction motion remained "pending" during that interim. The Supreme Court has explained that "an application is pending as long as the ordinary state collateral review process is in continuance — i.e., until the completion of that process." *Carey v. Saffold*, 536 U.S. 214, 219-20 (2002) (quotations omitted). "In other words, until the application has achieved final resolution through the State's post-conviction procedures, by definition it remains 'pending.'" *Id.* at 220.

The newly-furnished trial court orders show us that the first dismissal "without prejudice" did not terminate the post-conviction motion; it merely suspended it until a lawyer could be appointed for Ray. The first order reads in full:

<u>ORDER DISMISSING DEFENDANT'S MOTION
FOR RELIEF FROM JUDGMENT WITHOUT
PREJUDICE AND FOR APPOINTMENT OF COUNSEL</u>

Defendant having filed a Motion for Relief from Judgment on March 23, 2007 and having requested counsel be appointed to represent him in this matter;

Defendant's Motion to Appoint an attorney to represent him in a Motion for Relief from Judgment is granted;

Defendant's Motion for Relief from Judgment is dismissed without prejudice; and

IT IS SO ORDERED.

Order dated June 19, 2007 [ECF Doc. 41-3] (Pg ID 3081-82). The subsequent order reopening the case and allowing appointed counsel to supplement the motion reads:

<u>ORDER TO RE-OPEN DEFENDANT'S PRO PER 6500 MOTION</u>
<u>AND TO ALLOW SUPPLEMENT BY APPOINTED COUNSEL</u>

Defendant having filed a Motion for appointment of counsel to file a motion for relief from judgment pursuant to MCR 6.500; this court having granted that motion and the State Appellate Defender's Office having been appointed to represent defendant on appeal;

The attorney for the defendant shall file the motion for relief from judgment and brief in support thereof and the defendant's request that the case be reopened is granted; and

IT IS SO ORDERED.

Order dated Feb. 12, 2008 [ECF Doc. No. 41-4] (Pg ID 3083-84).

These supplemental filings confirm what the Court supposed earlier: that "the state court's 'dismissal without prejudice' of the first motion was not an adjudication of the motion but was rather an inartfully worded order by the judge to hold the motion in abeyance so that counsel could be appointed." *Ray v. Perry*, 2014 WL 3555968, at *3. The order entered next after that plainly stated that "*the defendant's request that the case be reopened* is granted," indicating that the state court viewed the "dismissal without prejudice" not as a conclusion of proceedings on the original motion but as a pause in the proceedings to allow the motion to be reviewed and resubmitted with the assistance of counsel. There would be no logical reason to "reopen" a motion on which proceedings had been concluded by disposition on the merits. Moreover, the caption of the order plainly stated that its effect was "to *re-open defendant's pro per 6500 motion* and to *allow supplement by appointed counsel*." That heading demonstrates without doubt that the state court viewed its action as merely resuming proceedings *on the original motion*, not on any fresh filing, for the purpose of considering supplements to the motion by appointed counsel.

The state court proceedings on the original Rule 6.500 motion were "in continuance" during the period from the "dismissal" to the filing of the supplemental motion for relief from judgment. The state court's orders indicate that the motion had not "achieved final resolution through the State's post-conviction procedures" when it was held in abeyance to allow counsel to be engaged; "by definition it remain[ed] 'pending'" for the entire time until it finally was adjudicated by the state trial court, and, thence, through the pendency of the ensuing appeal, until September 9, 2010. *Carey*, 536 U.S. at 219-20.

It is undisputed that Ray's post-conviction motion here was "properly filed." And Congress has mandated that the time during which the motion remained pending "*shall not be counted* toward any period of limitation." 28 U.S.C. §2244(d)(2) (emphasis added).

The state court finally denied relief on that motion on September 9, 2010, so the period between then and the March 23, 2007 filing date is excluded from the one-year limitation period. The arithmetic tells the rest of the story: only 24 days had run on the one-year clock before the motion was filed, and the petition filed on March 14, 2011, 186 days after the conclusion of the post-conviction appeal, fell comfortably within the one-year deadline.

### B.

The State also argues that a number of the petitioner's claims are procedurally defaulted for various reasons. It did not include Ray's *Brady* claim or ineffective assistance of appellate counsel claim within that defense. Of the remaining claims, only the *Cronic* issue was cited.

A procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). It will bar consideration of the merits of a federal claim if the state rule is

actually enforced and is an adequate and independent ground for the state court's decision. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002).

Elementally, the defense applies if:

(1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc) (quoting *Tolliver v. Sheets*, 594 F.3d 900, 928 n.11 (6th Cir. 2010)).

The petitioner's trial counsel objected before and during trial to the *in camera* proceeding from which he was excluded, and he protested the trial court's refusal to allow him access to the transcript, preserving the issue for appeal. That issue was not raised on direct appeal, but Ray included it in his post-conviction motion. The trial court never ruled on it, however.

There is nothing in this record suggesting that a state court — at any level — addressed Ray's *Cronic* claim at all, let alone that relief was denied because of a procedural lapse. No state procedural rule was enforced as to this claim, and therefore none can be cited as furnishing an adequate and independent state ground for denying relief.

Moreover, as discussed in detail below, Ray's appellate counsel's performance was deficient when he did not raise the issue on direct appeal, and that failure prejudiced Ray. Ineffective assistance of counsel may serve as "cause" for a procedural default if, as here, it rises to the level of a constitutional violation. *Martin v. Mitchell*, 280 F.3d 594, 605 (6th Cir. 2002). In fact, a "claim of ineffective assistance of counsel . . . can serve as both cause and prejudice, excusing a procedural default in an underlying substantive claim." *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006). Ray has established both. There is no procedural bar to addressing his federal claims.

III.

A.

AEDPA ushered in a highly deferential standard for reviewing a habeas petitioner's constitutional claims that were adjudicated by state courts. The petitioner must show that "the state court decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law' or involved an 'unreasonable determination of the facts.'" *Kelly v. Lazaroff*, 846 F.3d 819, 831 (6th Cir. 2017) (quoting 28 U.S.C. § 2254(d)). That standard applies "even when a state court does not explain the reasoning behind its denial of relief." *Carter v. Mitchell*, 829 F.3d 455, 468 (6th Cir. 2016). That is the review standard this Court applied to Ray's *Cronic* claim the first time around.

The court of appeals in this case suggested that it may not have been proper to subject that claim to such a deferential examination. That is because AEDPA's deference to state courts "applies only to 'claim[s]' that were 'adjudicated on the merits in State court proceedings.'" *Pouncy v. Palmer*, 846 F.3d 144, 159 (6th Cir. 2017) (quoting 28 U.S.C. § 2254(d)). "Under [*Harrington v. Richter*, 562 U.S. 86 (2011)], '[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on its merits in the absence of any indication or state-law procedural principles to the contrary.'" *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 460 (6th Cir. 2015) (quoting *Harrington*, 562 U.S. at 99). "Yet this presumption is not, as the *Richter* Court made clear, irrebuttable: '[t]he presumption may be overcome when there is reason to think some other explanation for the state

court's decision is more likely.'" *Ibid.* (quoting *Richter*, 526 U.S. at 99-100). As the Supreme Court

explained in *Johnson v. Williams*:

> The language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only
> when a federal claim was "adjudicated on the merits in State court." A judgment is
> normally said to have been rendered "on the merits" only if it was delivered after the
> court heard and evaluated the evidence and the parties' substantive arguments. And
> as used in this context, the word "merits" [refers to] "the intrinsic rights and wrongs
> of a case as determined by matters of substance, in distinction from matters of form."
> If a federal claim is rejected as a result of sheer inadvertence, it has not been
> evaluated based on the intrinsic right and wrong of the matter. . . . When the
> evidence leads very clearly to the conclusion that a federal claim was inadvertently
> overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered
> opportunity to make his case before a federal judge.

568 U.S. 289, 133 S. Ct. 1088, 1097 (2013) (quotations and citations omitted). "Claims that were

not 'adjudicated on the merits in State court proceedings' receive the pre-AEDPA standard of

review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for

questions of fact." *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011) (citing *Brown v. Smith*,

551 F.3d 424, 428, 430 (6th Cir. 2008)).

As the Sixth Circuit noted in its opinion remanding the case, there are strong indications in

the state court record that no state court had addressed the *Cronic* claim on the merits. As the court

of appeals explained:

> [T]he record indicates that Ray may be able to rebut the presumption that his *Cronic*
> claim was adjudicated on the merits in state court. Ray raised his critical stage claim
> in his state habeas petition and a supplemental motion. Specifically, Ray argued in
> his Supplemental Motion for Relief that his "defense was irretrievably lost by the
> trial court's failure to allow defense counsel's presence at the in-camera review, as
> well as the denial of the request for review of the record, as was requested by trial
> counsel . . . . A[nd] that period, moment, and event in the course of his criminal
> proceeding was a 'CRITICAL STAGE.'" The Wayne County Circuit Court
> characterized this claim as follows: "The court erred in failure to provide
> Straughter's relation with Romulus Police as an informant as revealed in an
> in-camera proceeding (raised in defendant's *pro per* supplemental motion, Oct. 16,
> 2008)." It then denied Ray's claim without any discussion of *Cronic*, the Sixth

Amendment, or critical stage jurisprudence. Instead, the state court rejected Ray's argument based on its conclusion that, as a matter of state evidentiary law, Straughter's relationship with the police was irrelevant. Relevance, however, is not the proper inquiry for a constitutional claim under *Cronic*; as mentioned above, the *Cronic* analysis turns on whether an individual was denied counsel during a critical stage of trial. The state court's analysis of Ray's *Cronic* claim, therefore, strongly suggests that the claim "was inadvertently overlooked in state court." *Johnson v. Williams*, 568 U.S. 289, 133 S. Ct. 1088, 1097 (2013).

There is another strong reason to conclude that the Wayne County Circuit Court failed to adjudicate Ray's *Cronic* claim on the merits. In rejecting Ray's Cronic claim, the Wayne County Circuit Court wrote: "This ground was raised by the defendant on a prior appeal. *See* Opinion, Court of Appeals, *People v. Ray*, III, Defendant Ray, paragraph B, page 14." That statement and the citation supporting it are both erroneous. Ray did not raise a *Cronic* claim in his direct appeal to the Michigan Court of Appeals. He did, however, raise a related *Brady* claim: in his Pro Per Supplemental Brief, Ray argued that the prosecution improperly withheld exculpatory impeachment evidence when it failed to disclose information about Straughter's relationship with the Romulus Police Department — information, Ray wrote, that the trial court had reviewed *in camera*.

The Michigan Court of Appeals — in paragraph B, on page *13 of its 2006 opinion — rejected this *Brady* claim. Perkins, 2006 WL 1330320, at *13. It thus appears that the Wayne County Circuit Court confused Ray's *Brady* claim (which he raised in his appeal as of right) with his *Cronic* claim (which he raised on state collateral review). That explains why the Wayne County Circuit Court did not cite *Cronic* or its progeny in its opinion. Put simply, the Wayne County Circuit Court's treatment of Ray's *Cronic* claim "leads very clearly to the conclusion that" that court "inadvertently overlooked" this claim. *Williams*, 133 S. Ct. at 1097.

Despite the strong reason to believe that Ray can rebut the presumption that the state court adjudicated the merits of his *Cronic* claim, the district court analyzed Ray's *Cronic* claim with AEDPA deference without making the preliminary determination that the deferential standard should be applied. This omission was understandable. Ray was *pro se* before the district court, and the notion that the state court decision failed to adjudicate Ray's *Cronic* claim on the merits was first raised by appointed counsel in Ray's reply brief on appeal. Nonetheless, the district court's decision omitted a crucial, preliminary analytical step, one that carries serious implications for the merits of Ray's petition.

*Ray v. Maclaren*, 655 F. App'x at 309-10 (citations omitted).

The State has not pointed to anything in the record that could convincingly rebut that view of the state trial court's ruling. The state court's treatment of the issue certainly suggests, as the court of appeals concluded, that it simply misconstrued or overlooked the actual claim that was raised. The State also has not pointed to any other ruling of any state court squarely addressing the *Cronic* claim. Because the *Cronic* claim was not decided on the merits, AEDPA deference does not apply, and the correct standard of review is *de novo* (for questions of law) and clear error (for findings of fact). *Robinson*, 663 F.3d at 823; *see also Phillips v. White*, 851 F.3d 567, 571 (6th Cir. 2017) (holding that "AEDPA's deferential standard is inapplicable to [the petitioner]'s claim because no state court ever decided it").

## B.

The complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice. *Cronic*, 466 U.S. at 659. However, the Supreme Court never has held that all improper *ex parte* conferences between a judge and a prosecutor during trial amount to a *Cronic* error. *See Hereford v. Warren*, 536 F.3d 523, 529 (6th Cir. 2008). The Supreme Court has "characterized a 'critical stage' as one that 'held significant consequences for the accused.'" *Woods v. Donald*, --- U.S. ---, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *Bell v. Cone*, 535 U.S. 685, 696 (2002)). The Court variously has defined a "critical stage" as circumstances where: (1) "[a]vailable defenses may be . . . irretrievably lost, if not then and there asserted," *Hamilton v. State of Ala.*, 368 U.S. 52, 54 (1961); (2) "rights are preserved or lost," *White v. State of Md.*, 373 U.S. 59, 60, 83 (1963); (3) the presence of counsel is "necessary to assure a meaningful 'defence,'" *United States v. Wade*, 388 U.S. 218, 225 (1967); or (4) "potential substantial prejudice to

defendant's rights inheres in the particular confrontation and the [presence] of counsel [would] help avoid that prejudice," *Coleman v. Alabama*, 399 U.S. 1, 7 (1970).

The Sixth Circuit has "refused to label *ex parte* communications critical stages in all cases." *Hereford*, 536 F.3d at 530 n.4 (citing *United States v. Carmichael*, 232 F.3d 510, 517 (6th Cir. 2000) (holding that *ex parte* discussions between a prosecutor and a judge concerning the contents of Title III wiretap transcripts is not a critical stage)).  In the previous opinion, this Court denied relief on the *Cronic* claim because there was no clearly established federal law holding that an *in camera* conference, where defense counsel was excluded, constituted a critical stage of the proceedings. Relief could not be granted under AEDPA's rigid standards.

Now, however, the landscape has changed, not only because AEDPA's deferential review no longer applies to this issue, but also — and perhaps more importantly — because the substance of the secret conference has become known.  In light of that new information, Ray is entitled to a new trial under the rule of *Cronic*, regardless of which standard of review applies.  Under any of the formulations adopted by the Supreme Court to characterize a "critical stage" of the proceedings, this hearing certainly qualified.

The State's main witness against Ray was Christopher Straughter.  He put Ray at the scene and testified to the elements of the assault and robbery charges.  Defense counsel challenged Straughter's credibility by attempting to show, among other things, that Ray had a relationship with the Romulus police department, the agency that investigated the murders.  He was tipped off to that possibility by a note found in the discovery materials, written by a Romulus police detective, that read, "Straughter continues to call [the detective] for money."  Defense counsel's effort to follow that lead through a discovery demand is what prompted the *in camera* hearing.  As noted, defense

counsel was not allowed to participate in that hearing, and afterward the trial judge announced on the record that there was "no relevant relation between this case and Mr. Christopher Straughter and the Romulus Police Department." Not satisfied with that ruling, defense counsel moved to exclude Straughter's testimony if the transcript of the *in camera* hearing were not disclosed to him. And bereft of concrete proof of Straughter's relationship with the police, defense counsel was left with the weaker argument that Straughter was lying about Ray's involvement to hide his association with the robbed drug house.

After the case was remanded to this Court, the transcript of the *in camera* hearing was unsealed by the trial court, upon the motion of the Wayne County prosecutor, and the State filed a copy of it as part of the supplemental Rule 5 materials. During that hearing, the following colloquy occurred between the state court trial judge and the prosecutor:

> PROSECUTOR: . . . . The record should reflect that at the People's request the courtroom has been cleared and only present is the court staff, the [trial judge] and Detectives [*sic*] Sergeant Mike Smith and Detective Mike St. Andre, both officers in charge of this case. Judge, the issue in discovery that was raised on behalf of counsel related to any relationship that complaining witness [Christopher Straughter] had with the Romulus Police Department. In following up with that inquiry it has come to my attention that Chris Straughter has in fact been used as a confidential informant.

> THE COURT: In the past?

> PROSECUTOR: Yes, in the past. . . . Prior uses of him as a CI date back as early as August of '03. This date of offense for which he is a complaining witness [was] July 18th of '04.
> . . .
> THE COURT: Okay. And then the defense has a motion to determine what the relationship with the police department was. . . . You're saying he was used as a confidential informant.

> PROSECUTOR: In the days that [preceded] this shooting and at least twice since the day of the shooting . . . .
> . . .

-17-

THE COURT:  Okay.  And what [the police log presented to the court shows is] a summary of things that [Straughter] has done.

PROSECUTOR:  Correct, Judge.

THE COURT:  And consideration he's received.

PROSECUTOR:  Correct.

Hr'g Tr. at 4-7 (Nov. 5, 2004) (Pg ID 3015-18).  The police detective who handled Straughter testified that Straughter was used to conduct undercover drug buys on four occasions before the shooting and two dates after the shooting, but he asserted that the drug buys in question were "totally unrelated" to any of the defendants at Ray's trial.  *Id.* at 8-9 (Pg ID 3020-21).  The prosecutor also represented to the trial court that "based on my information and belief none of [these CI contacts] involve any of these three defendants."  *Id.* at 13 (Pg ID 3024).  The trial court ordered the transcript of the *in camera* hearing to be sealed, *id.* at 16 (Pg ID 3027), and it is undisputed that the substance of the discussion on the record never was disclosed to Ray or any of his attorneys until the transcript recently was unsealed, upon the motion of the prosecutor, and filed in this Court as part of the supplemental Rule 5 materials after the case was remanded.

What was the impact of defense counsel's absence from that hearing?  Critically, Ray's attorney was given no opportunity to contest the basis of the trial court's ruling that the exculpatory impeaching evidence of Straughter's employment as a paid informant should not be disclosed.  The value of that information to Ray's defense was substantial.  (More on that later.)  But the loss of a chance even to make an argument for disclosure cut off that line of impeachment before it got started.  This was, by any reasonable reading of the clear Supreme Court holdings on point, a proceeding in which an available avenue of defense was lost, the presence of counsel for the defendant was necessary to assure a meaningful defense, substantial prejudice to the defendant's

rights inhered in the particular confrontation, and the presence of counsel would have helped to avoid the resulting prejudice.

This Court's earlier denial of relief on this claim was made without the benefit of any information about what happened at the hearing, and in the face of the State's categorical (and categorically false) assertion in its response to the petition that "[t]here is no indication that the prosecutor withheld anything, let alone that it was exculpatory." Resp. to Petition [dkt. #7] at 62 (Pg ID 2403). The revelation that Straughter in fact was a paid confidential informant, who assisted police on at least six occasions — four before and two after the alleged crimes — puts this claim on a whole new footing. It is true that the Supreme Court never categorically has held that just any *ex parte* contact between the court and prosecution is *per se* a critical stage of the proceedings. But the conference here was far more than that.

Moreover, if the Court considers this claim *de novo*, then the case stands in an entirely different posture in the shadow of *United States v. Minsky*, 963 F.2d 870 (6th Cir. 1992), where the Sixth Circuit, on remarkably similar facts, held as follows:

> Although there are circumstances where an *ex parte* communication might be overlooked, the burden of proving lack of prejudice is on the government, and it is a heavy one. The *ex parte* conference in the instant case occurred at a time when the defense was arguing that the FBI 302s were subject to disclosure under the Jencks Act and *Brady*. The release of this material would have allowed the defense to undermine the credibility of Brown, a key government witness. The government has proffered no explanation why the defense was denied an opportunity to participate in a conference at such a critical stage of the proceedings. We refuse to condone conduct that undermines confidence in the impartiality of the court.
>
> We hold that the *ex parte* sidebar conference violated Minsky's right to a fair trial and was a Sixth Amendment violation. Although this violation is sufficient alone to require the granting of a new trial, in view of the related *Brady* and Jencks Act claims, we shall address them as well.

*Minsky*, 963 F.2d at 874. *Minsky* was a decision on direct review; it did not compel a ruling for the petitioner when AEDPA's deferential review standard applied. However, under a *de novo* standard of review, *Minsky* is no longer merely persuasive or suggestive of an appropriate rule of law; it is controlling circuit precedent that is binding on this Court. Absent the strictures of deferential review, Ray's claim for relief on this ground is undeniable.

Finally, this case is sharply distinguishable from cases where an *in camera* evaluation of government witnesses has been found not to be a critical stage, where counsel, although excluded from the hearing, was allowed ample opportunity to influence and contest the outcome. For example, in *United States v. Johnson*, 65 F. App'x 628 (9th Cir. 2003), the court noted that:

> Johnson's counsel was allowed to submit a list of questions for the district court to ask, the court asked the questions, and Johnson's attorney had a chance to cross-examine the informants before trial. Also, Johnson's counsel forcefully objected to the *in camera* proceeding and was obviously knowledgeable about the nature of the proceeding. There is no suggestion in the record that she was not useful in helping Johnson understand what was going on. And the *in camera* hearings involved a preliminary evidentiary question, not the merits of the charges. In these circumstances, neither Johnson's right to counsel nor his right to due process was violated.

65 F. App'x at 630. Here there were no such opportunities for counsel to learn about the substance of the hearing, to have any input into the Court's deliberations, or effectively to contest the ruling after it was made.

Ray was denied his right to counsel at a critical stage of the case.

## C.

The Supreme "Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. 648, 659 n.25. Yet the State argues that even

if Ray was denied counsel, as *Cronic* prohibits, the error was harmless. That argument is a non-starter. "[I]t is 'settled that a complete absence of counsel at a critical stage of a criminal proceeding is a *per se* Sixth Amendment violation warranting reversal of a conviction, a sentence, or both, as applicable, without analysis for prejudice or harmless error.'" *United States v. Amir*, 644 F. App'x 398, 400 (6th Cir. 2016) (quoting *United States v. Ross*, 703 F.3d 856, 873-74 (6th Cir. 2012)); *see also Van v. Jones*, 475 F.3d 292, 311-12 (6th Cir. 2007) (holding that a defendant who is deprived of counsel at a critical stage suffers "a *per se* Sixth Amendment violation warranting reversal of a conviction, a sentence, or both, as applicable, without analysis for prejudice or harmless error").

The point of *Cronic* is that when a defendant is denied counsel at a critical stage, the error is "structural," because it has "consequences that are necessarily unquantifiable and indeterminate." *Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993). Structural errors "'defy analysis by 'harmless-error' standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991)). For those reasons, "[a] violation of a defendant's right to counsel at a critical stage is a structural error, and is therefore not subject to an analysis of whether the error was harmless or prejudicial." *Benitez v. United States*, 521 F.3d 625, 630 (6th Cir. 2008) (citing *Gonzalez-Lopez*, 548 U.S. 140).

The four Supreme Court cases cited by the State all are distinguishable because none of them involved a "structural error" or the absence of counsel during a "critical stage" of the trial.

In *Coleman v. Alabama*, 399 U.S. 1 (1970), the issue presented was whether harmless error applied to the absence of counsel during a preliminary examination, and the Court held that the error could be found to be harmless, because it was undisputed that nothing said by the defendant or that

otherwise transpired on the record at the hearing was offered in evidence at trial. As the court noted: "The trial transcript indicates that the prohibition against use by the State at trial of anything that occurred at the preliminary hearing was scrupulously observed," and "on the record it cannot be said whether or not petitioners were otherwise prejudiced by the absence of counsel at the preliminary hearing." *Coleman*, 399 U.S. at 10–11.

Similarly, in *United States v. Wade*, 388 U.S. 218 (1967), the Court concluded that harmless error analysis applied to the absence of counsel at an out-of-court lineup because at trial only the in-court identification of the defendant by a witness was allowed into evidence, and there was no testimony about the identification at the prior out-of-court lineup where counsel was not present. The *Wade* Court held that "[w]here . . . the admissibility of evidence of the lineup identification itself is not involved, a per se rule of exclusion of courtroom identification would be unjustified." *Wade*, 388 U.S. at 240. However, in *Wade* the Court also explicitly noted that it had "reach[ed] a contrary conclusion in [*Gilbert v. California*, 388 U.S. 263, 273 (1967)], as to the admissibility of the witness' testimony that he also identified the accused at the lineup." *Id.* at 240 n.32 (citing *Gilbert*, 388 U.S. at 273 ("Only a *per se* exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup.")).

In *Satterwhite v. Texas*, 486 U.S. 249 (1988), the Court found that the claim of error due to the absence of counsel during a psychiatric examination in a death penalty case was subject to harmless error because the only question was whether the psychiatrist's testimony should have been admitted during the sentencing phase of the trial. *See* 486 U.S. at 251 ("In *Estelle v. Smith*, 451 U.S. 454 (1981), we recognized that defendants formally charged with capital crimes have a Sixth

Amendment right to consult with counsel before submitting to psychiatric examinations designed to determine their future dangerousness. The question in this case is whether it was harmless error to introduce psychiatric testimony obtained in violation of that safeguard in a capital sentencing proceeding."). The Court contrasted that situation with other cases where "structural error" was found to preclude any harmless error review. 486 U.S. at 257 ("*Holloway*, *Gideon*, *Hamilton*, and *White* were all cases in which the deprivation of the right to counsel affected — and contaminated — the entire criminal proceeding. In this case, the effect of the Sixth Amendment violation is limited to the admission into evidence of Dr. Grigson's testimony.").

Finally, in *Davis v. Ayala*, --- U.S. ---, 135 S. Ct. 2187, 2197 (2015), the question presented was whether the use of a procedure whereby the prosecutor was allowed to explain the rationale for peremptory strikes in a conference with the trial judge without defense counsel present was subject to harmless error analysis. The Court noted that it was undisputed in that case that the *Batson* colloquy between the judge and prosecutor was not a "critical stage" of the case, nor had the habeas petitioner argued on appeal that it was. *Davis*, 135 S. Ct. at 2197 ("Ayala contends that his federal constitutional rights were violated when the trial court heard the prosecution's justifications for its strikes outside the presence of the defense . . . . In the absence of 'the rare type of error' that requires automatic reversal, relief is appropriate only if the prosecution cannot demonstrate harmlessness. The Ninth Circuit did not hold — and Ayala does not now contend — that the error here falls into that narrow category, and therefore Ayala is entitled to relief only if the error was not harmless.").

None of those cases deal with the type of error found here, where defense counsel was excluded from an *in camera* hearing where the court was asked to determine the import of material evidence that weighed heavily on the credibility of the State's key witness. Instead, this case

presents one of "those limited instances in which [the Supreme] Court has found an error 'structural.'" *Hedgpeth v. Pulido*, 555 U.S. 57, 67 (2008). The Supreme Court counts this circumstance among those where a constitutional violation occurs "without any showing of prejudice." *Cronic*, 466 U.S. at 659 n.25 (collecting cases). The error here "entitl[es] the defendant to a new trial without a specific showing of prejudice because the error makes 'the adversary process itself presumptively unreliable.'" *Hereford v. Warren*, 536 F.3d 523, 529 (6th Cir. 2008) (quoting *Cronic*, 466 U.S. at 659 n.25).

Because Ray was denied counsel at a critical stage of his case, prejudice is presumed, and he is entitled to a new trial.

IV.

The court of appeals directed this Court to reconsider Ray's claim that his appellate counsel was constitutionally ineffective. The basis of his claim is appellate counsel's failure to raise the *Cronic* issue on direct appeal. Ray raised that argument in his post-conviction motion filed in the state court. The trial judge rejected the claim because he found that it was "unsupported by any fact of record." He also found that "[c]ounsel was not ineffective for not raising the issues presented in this motion on appeal." The court did not address specifically Ray's *Cronic* claim. And the likely reason, as noted above, is that the court did not understand that Ray actually asserted such a claim.

The right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To prevail on a claim of ineffective assistance of appellate counsel, the petitioner ordinarily must demonstrate that appellate counsel's performance was deficient and that the deficient performance prejudiced the appeal. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient

if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotation marks omitted).

One of the main strategic decisions appellate counsel must make is choosing the issues to advance on appeal. *Smith v. Murray*, 477 U.S. 527, 536 (1986) ("'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.") (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). And "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. But there are instances when the "[f]ailure of appellate counsel to raise an issue can amount to constitutionally ineffective assistance." *McFarland v. Yukins*, 356 F.3d 688, 710 (6th Cir. 2004). The Sixth Circuit has assembled a list of factors to consider when questioning appellate counsel's performance:

(1) Were the omitted issues "significant and obvious"?
(2) Was there arguably contrary authority on the omitted issues?
(3) Were the omitted issues clearly stronger than those presented?
(4) Were the omitted issues objected to at trial?
(5) Were the trial court's rulings subject to deference on appeal?
(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
(7) What was appellate counsel's level of experience and expertise?
(8) Did the petitioner and appellate counsel meet and go over possible issues?
(9) Is there evidence that counsel reviewed all the facts?
(10) Were the omitted issues dealt with in other assignments of error?
(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Id.* at 711 (quoting *Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999)).

Ray's lawyer on his direct appeal raised four issues in his appellate brief: (1) a challenge to the jury *voir dire* and jury instructions; (2) prosecutorial misconduct; (3) sufficiency of the evidence; and (4) a sentencing issue. He did not raise any issue about the *ex parte*, *in camera* proceeding, even though the trial record demonstrated trial counsel's robust and frequent objections to being cut off from that information. It does not appear that appellate counsel sought to unseal the transcript of that hearing. The *in camera* hearing earned no more that a three-line reference in the appellate brief.

The State argues that the omitted *Cronic* issue was not obvious, inasmuch as counsel for the two codefendants apparently missed the issue as well. Certainly, that issue was not advanced by any of the defendants' attorneys on direct appeal. But Ray was not similarly situated with the other defendants. He never entered the house, either before or after the shots were filed. Defendant Elam was inside from the beginning, and Perkins entered the house right before the shots rang out. Straughter's identification of Ray, and his description of Ray's activity, would have been much more vulnerable to a credibility attack. And Straughter's relationship with the Romulus police was more significant to that line of defense. There was no secret that the trial judge held a hearing to address trial counsel's discovery request, or that trial counsel was excluded from that hearing. Curiosity alone, it seems, would propel the average lawyer to learn what happened at that hearing — perhaps by moving to unseal the record — and, failing that, to raise the issue on appeal. Second guessing appellate counsel is seldom a useful exercise, as the view of the case in hindsight is always different. *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003) (stating that "[a] fair assessment of attorney performance requires that every effort be made 'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time'") (quoting *Strickland*, 466 U.S. at 689). But when trying to stand

in the shoes of appellate counsel looking forward, some issues present themselves as very significant and obviously deserving of review. This was one of them.

There was clear Supreme Court precedent for the eponymous *Cronic* issue. Ray was denied counsel during an *ex parte* hearing, which turned out to be a critical stage in his prosecution. And as the petitioner's present counsel points out, Ray's state appellate lawyer missed a similar issue on a state court criminal appeal years earlier. *See id.* at 349 n.6. One might think that the experience would have sensitized him to the issue.

The *Cronic* issue certainly was stronger than the issues advanced, one of which was unpreserved and submitted under a plain error theory. The *Cronic* issue, on the other hand, was well preserved by trial counsel's objection to the lack of access to the *in camera* hearing transcript. The state court did not hold a hearing on Ray's post-conviction motion, so appellate counsel's reasoning for omitting the issue remains unexplained. However, a letter in the record from the Michigan Appellate Assigned Counsel System to appellate counsel states that the appellate lawyer never met with Ray before filing the appellate brief; that lapse violated the System's minimum standards.

The state trial judge cited the appropriate federal precedent (*Evitts v. Lucey*) when addressing this issue. However, he did not evaluate the *Cronic* claim, probably due to oversight, as discussed above; and he did not parse any factors in determining whether appellate counsel's performance was defective. Because the performance obviously *was* defective, and "there is [no] reasonable argument that counsel satisfied *Strickland's* deferential standard," *Harrington v. Richter*, 562 U.S. 86, 105 (2011), it must be found that the state court did not reasonably apply established Supreme Court precedent on this issue.

It has been said that "the *Strickland* performance and prejudice prongs tend to blur when considering the performance of appellate counsel, as the prejudice inquiry will generally inform whether appellate counsel met the standard of professional competence." *Caver*, 349 F.3d at 348 n.5 (citing *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989)). So it is here. But for appellate counsel's deficient performance, the outcome of the state appeal probably would have been favorable to Ray. As discussed earlier, the *Cronic* issue is meritorious, and it likely would have led to a new trial if it had been raised.

Ray is entitled to a writ of habeas corpus on this claim.

## V.

In the earlier opinion, the Court denied the petitioner's claim that his right to the disclosure of exculpatory evidence under *Brady v. Maryland* was abridged. The Court rejected that claim because the petitioner could not show that any of the information discussed during the *in camera* hearing was exculpatory and material to his defense.

After the court of appeals remanded this case, the petitioner filed a motion for relief from that part of the order, relying mainly on the new revelation of the transcript of that hearing. The motion is based on Federal Rule of Civil Procedure 60(b)(2), (3) and (6).

Federal Rule of Civil Procedure 60(b) allows the Court to relieve a party from a final judgment or order for several reasons, including "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . . ; [or] (3) fraud . . ., misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b). Rule 60(b)(6) also permits the court to grant a motion for relief from judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

An unsuccessful habeas petitioner may not use Rule 60(b) as a back-door to circumvent the usual prohibition on second or subsequent habeas filings, or to relitigate positions already advanced in his petition and rejected by the Court. *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005). "[H]owever, when a Rule 60(b) motion attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings," then relief from a judgment denying habeas claims may be available via Rule 60(b). *Ibid.* "Fraud on the federal habeas court is one example of such a defect." *Id.* at 532 n.5 (citing *Rodriguez v. Mitchell*, 252 F.3d 191, 199 (2d Cir. 2001) (holding that a witness's allegedly fraudulent basis for refusing to appear at a federal habeas hearing "relate[d] to the integrity of the federal habeas proceeding, not to the integrity of the state criminal trial")).

The "limited circumstances" in which Rule 60(b) also may be used to grant relief in habeas cases also include those where the petitioner has come into possession of "newly discovered evidence," as long as the grant of relief is "not inconsistent" with the governing law under AEDPA, such as the one-year statute of limitations (i.e., where the petitioner promptly moves for relief from judgment within the limitations period and any applicable procedural time limits). *Hill v. Mitchell*, 842 F.3d 910, 921 (6th Cir. 2016) ("These limited circumstances include 'newly discovered evidence,' such as the police report or the grand jury testimony, under Rule 60(b)(2).").

Ray contends that the new evidence from the unsealed *in camera* hearing transcript shows that the Court's consideration of that claim was stymied by the State's false representation that there was no indication in the record that any information about Straughter was withheld by the prosecutor. He argues that he is entitled to relief under Rule 60(b)(2) and (3) based on this newly discovered evidence that bolsters his claim, which he was unable to obtain, despite diligent efforts

to do so during the trial proceedings and afterward, and because the fraudulent representation by the State injected a crucial false premise that was accepted by the Court as a basis for denying the *Brady* claim. The State did not file any response to this motion.

The Court agrees that Ray is entitled to relief from the judgment under Rule 60(b)(2) and (3), because the Court's ruling was based on the false premise — which the State fraudulently advanced before this Court — that there was nothing in the state court record to suggest that any material information was withheld by it from the defense before trial.

It appears that the state appellate court based its ruling on the same false premise. Ray raised the issue on direct appeal in a supplemental brief filed *pro se*. In rejecting that claim, the court wrote:

> In reading defendant Ray's Standard 4 brief it is difficult to discern exactly what evidence he believes the prosecutor suppressed. Defendant Ray references review of "in-camera proceedings that took place a week and a half ago with the Court" but does not explain what was captured in the in-camera proceedings. Defendant Ray also references an apparent message left by Straughter about "getting money" and further testimony from Straughter with no more explanation. Defendant Ray has barely identified the evidence he claims the prosecutor suppressed and has failed to show how any missing evidence was exculpatory in nature or that the prosecutor suppressed any evidence in bad faith. From defendant Ray's characterization, we cannot conclude that the prosecutor engaged in misconduct amounting to plain error affecting defendant Ray's substantial rights.

*Ray*, 2006 WL 1330320, at *13 (citations omitted).

If the state court of appeals had access to the sealed transcript of the *in camera* hearing, its conclusion unreasonably applies the Supreme Court jurisprudence discussed below. If it did not review that transcript, as apparently was the case, then its decision was an unreasonable determination of the facts presented at that state court hearing. *See* 28 U.S.C. § 2254(d)(1), (2).

By now (and even in 2006), it is pellucidly clear that "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Wearry v. Cain*, --- U.S. ---, 136 S. Ct. 1002, 1006 (2016) (per curiam) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "[T]he rule stated in *Brady* applies to evidence undermining witness credibility." *Ibid.* (citing *Giglio v. United States*, 405 U.S. 150, 153-54 (1972)). "Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Ibid.* (quoting *Giglio*, 405 U.S. at 154) (quotation marks omitted). "To prevail on his *Brady* claim, [the defendant] need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Ibid.* (quoting *Smith v. Cain*, --- U.S. ---, 132 S. Ct. 627, 630 (2012)). "He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Ibid.* "[The defendant] can prevail even if [] the undisclosed information may not have affected the jury's verdict." *Id.* at 1006 n.6.

The newly-disclosed transcript of the *in camera* hearing shows the trial judge believed that evidence of Straughter's financial involvement with the Romulus Police Department was not "relevant" to the defense. Relevance, however, is not the touchstone for assaying the exculpatory value of impeaching evidence — materiality is. And the conclusion that this evidence was material to Ray's defense is beyond debate.

It is well recognized that "'[t]he use of informers . . . may raise serious questions of credibility.'" *Robinson v. Mills*, 592 F.3d 730, 737 (6th Cir. 2010) (quoting *On Lee v. United States*, 343 U.S. 747, 757 (1952)). *Robinson*'s facts, which are remarkably similar to those here, graphically illustrate that point. Robinson was convicted of murdering a drug dealer. At trial, he

pleaded self-defense. An eyewitness gave testimony that tended to undercut that claim — she was the only state witness to do so. Predictably, Robinson's attorney attempted to impeach her with questions highlighting prior inconsistent statements and her drug history. But the prosecution never told the defense that the witness had been a police informant at least seven other times and was paid for her cooperation in another case.

Although none of the witness's other informant roles related to Robinson's case, the court affirmed the issuance of the writ because of the *Brady* violation, The court explained that "jurors often have a negative predisposition toward informants." *Ibid.* "'Ordinary decent people are predisposed to dislike, distrust, and frequently despise criminals who "sell out" and become prosecution witnesses. Jurors suspect their motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable.'" *Ibid.* (quoting Stephen S. Trott, Words of Warning for Prosecutors Using Criminals as Witnesses, 47 Hastings L.J. 1381, 1385 (1996)); *see also Banks v. Dretke*, 540 U.S. 668, 701-02 (2004) (favorably citing Trott, Words of Warning). "Accordingly, since 'a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions,' the State's suppression of this evidence deprived [the petitioner] of the opportunity to demonstrate [the witness's] untrustworthiness." *Ibid.* (quoting *On Lee*, 343 U.S. at 757). "Given juries' negative predisposition regarding informants, the trial jury would likely have been suspicious of [the informant witness] and cautious about [his] testimony," and such "suspicion could have very likely redounded to [the petitioner's] benefit." *Ibid.*

There's more. It takes little imagination to see how a journeyman defense lawyer might have used the evidence in this case that Straughter was being paid by the Romulus police to conduct drug

buys, both before and after the murders. Straughter's undercover work was earning him money, and he would have been highly motivated to keep that income stream flowing. The police maintained that they were not working with Straughter when he responded to defendant Elam's call to sell drugs at Zarbaugh's house. Freelancing other drug sales certainly would have damaged Straughter's reliability in the eyes of the police, conceivably terminating his paid informant role. Straughter would have had a personal stake in slanting his testimony to characterize himself as a victim. And his relationship with the police would have been cause for him to slant his testimony in favor of the prosecution.

For these reasons, "[t]he suppressed evidence could have also supported the assertion that at the time of trial, [the witness] was biased in favor of the local authorities." *Robinson*, 592 F.3d at 737. "The term 'bias' describes 'the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party.'" *Ibid.* (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984)). "Bias is 'not limited to personal animosity against a defendant or pecuniary gain.'" *Ibid.* (quoting *Schledwitz v. United States*, 169 F.3d 1003, 1015 (6th Cir. 1999)). "[I]t includes mere 'employment or business relationships' with a party and 'is always relevant in assessing a witness's credibility.'" *Ibid.* "A defendant has the constitutional right to impeach a witness by showing bias." *Ibid.* (citing *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)). "If a defendant is denied this right, then a new trial must be granted, except if the error was harmless." *Ibid.* (citing *United States v. Stavroff*, 149 F.3d 478, 481 (6th Cir. 1998)). "However, 'once a reviewing court applying *Bagley* has found constitutional error, there is no need for further harmless-error review, since the constitutional standard for materiality under *Bagley* imposes a

higher burden than the harmless-error standard of *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)." *Ibid.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 419-20 (1995)).

The Sixth Circuit again reiterated the fundaments discussed in *Robinson*, finding an actionable *Brady* violation in *Thomas v. Westbrooks*, 849 F.3d 659 (6th Cir. 2017). In that case, the State failed to disclose that a "pivotal" witness against the defendant had been paid $750 by the Federal Bureau of Investigation before trial. After reviewing the *Robinson* decision, the court emphasized that a criminal defendant "has the right to impeach the State's witnesses against him on the grounds of pecuniary bias in the case." 849 F.3d at 665 (citations omitted). And "[t]his right is especially important when, as here, the case 'hinge[s] on the jury's critique' of a key witness." *Ibid.* The denial of that right — the "constitutional right to present a complete and full-throated defense" — the court said, will "render[] the defendant's trial fundamentally unfair." *Id.* at 666.

Similarly here, counsel for the defense made vigorous efforts to learn the details of Straughter's relationship with the police, and those efforts were annulled by the prosecutor's refusal to disclose the information, and the state court's erroneous conclusion that the information was not "relevant." The information was in fact relevant, but more to the point, it was material. The information about the witness should have been disclosed, but it was not. As a result, Ray was unable to impeach one of two eyewitnesses against him at trial. Contrary to the State's position, that failure was not absolved by the mere fact that the petitioner "admitted he was present," at the scene, because Straughter testified to far more than Ray's presence. He also testified that:

> Ray stood over Straughter and Booker at gunpoint outside the house while Perkins went into the house. Elam, Zarbaugh and Moore were still inside the house. Shots were fired. Perkins and Elam came out of the house.
> . . .
> Straughter and Booker were threatened as they lay on the ground. They overheard discussions about killing them. They got up and ran. Straughter and Booker were

-34-

> shot at, but the guns did not discharge because they were either empty or jammed. Straughter and Booker continued to run from the scene. All three perpetrators, Elam, Ray and Perkins, fled the scene in Perkins' silver Explorer.

*Ray v. Maclaren*, 655 F. App'x at 303. That testimony was central to the State's theory of the case that Ray was not simply present at the scene, but also actively aided and abetted the crimes by seizing and holding hostages at gunpoint, threatening them, and firing — or attempting to fire — shots at the witnesses as they fled.

The State contended in its response to the petition that Ray failed to make an adequate showing of materiality under *Bagley*, because even without Straughter's testimony the remaining evidence given at trial — in particular the identification of the petitioner by the other eyewitness, Booker — was enough to secure a conviction. However, as the *Kyles* court emphasized, sufficiency of the evidence is not the standard for materiality in the context of a *Brady* claim:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."
>
> The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles*, 514 U.S. at 434-35 (quoting *Bagley*, 473 U.S., at 678).

The state courts did not faithfully apply these precedents, even though "[t]his rule is clear, and none of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone. *Kyles*, 514 U.S. at 435 n.8.

Ray has shown that "the new evidence is sufficient to 'undermine confidence' in the verdict," *ibid.* That is sufficient for him to "prevail even if [] the undisclosed information may not have affected the jury's verdict," *Wearry*, 136 S. Ct. at 1006 n.6. The government had two material, compelling eyewitnesses. The withheld information well could have destroyed the credibility of one of those witnesses in the eyes of the jury, and that suffices to put the case into a markedly different light. Disclosure of the withheld information would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense. *Kyles*, 514 U.S. at 441.

The revelation of Straughter's police relationship, heretofore suppressed, is sufficient to undermine confidence in the verdict. Ray has established both that he is entitled to relief on this claim, and that he was prevented from raising it earlier due to the suppression by the State of the crucial information needed to sustain it.

## VI.

Petitioner John Henry Ray has established that he is entitled to a new trial on the basis of the structural error abridging his Sixth Amendment right to counsel during a critical stage of the case, a violation of his Sixth Amendment right to the effective assistance of appellate counsel, and a violation of his right to the disclosure of material exculpatory evidence under the Due Process Clause. The state courts unreasonably applied clearly established federal law as determined by the Supreme Court when adjudicating the latter two issues.

Accordingly, it is **ORDERED** that the petitioner's motion for relief from judgment [dkt. #45] is **GRANTED**.

It is further **ORDERED** that the petition for the writ of habeas corpus is **GRANTED**.

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings him to trial again within seventy days.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   April 13, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 13, 2018.

s/Susan Pinkowski
SUSAN PINKOWSKI